# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEVAUN LAROY LOPEZ,

        Defendant-Appellant.

FOR PUBLICATION
August 18, 2016
9:00 a.m.

No. 327208
Saginaw Circuit Court
LC No. 14-040317-FC

Before: STEPHENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM.

The Due Process Clause of the Fourteenth Amendment affords an accused a constitutional right to present witnesses in his own defense. Substantial government interference with a defense witness's choice to testify violates this right.

Here, the interference involved a *prosecution* witness, Dennis Hoskins. Minutes after Hoskins agreed to testify at Lopez's trial, the prosecutor threatened Hoskins that deviation from his preliminary examination testimony would result in prosecution for perjury and life imprisonment on conviction. Hoskins subsequently invoked his Fifth Amendment privilege, and his preliminary examination testimony was presented to the jury. The trial court acknowledged that Hoskins refused to testify because he felt "threatened" by the prosecutor. Lopez contends that because the prosecutor's conduct procured Hoskins' unavailability, the prosecutor was precluded from relying on an exception to the hearsay rule, MRE 804(1), to support the introduction of Hoskins' former testimony.

Our Supreme Court has forcefully condemned prosecutorial intimidation of witnesses, *People v Pena*, 383 Mich 402; 175 NW2d 767 (1970), and so has this Court. *People v McIntosh*, 142 Mich App 314; 370 NW2d 337 (1985). No principled basis exists for distinguishing between the intimidation of defense witnesses and the silencing of prosecution witnesses. Because the prosecutor's threat procured Hoskins' unavailability, the trial court erred by admitting Hoskins' recorded testimony. We vacate and remand for a new trial.

I

Lopez and his codefendant, Jarriel Reed, stood trial for the shooting death of Terry Johnson. Johnson was gunned down as he stood on a Saginaw sidewalk. He had just finished a trip to a nearby market, accompanied on the walk by his mother, Diane Austin, and a friend.

-1-

Austin immediately deduced that Johnson's ex-girlfriend, Dominique Williams, had fired the fatal shots, as Johnson and Williams had engaged in "a real raging argument" earlier that day. Following the argument, Williams had threatened to kill Johnson and brandished a knife to validate her intentions. The police cleared Williams after interviewing her and conducting a comprehensive investigation. The investigation unearthed several pieces of evidence tying Lopez and Reed to the shooting.

The investigating officers found fresh, spent .380 caliber shell casings approximately one block from the scene. One officer recognized the casings as identical in caliber, color and brand to those found near a drive-by shooting committed eight days earlier. The police suspected that Hoskins had been the shooter in that case, accompanied by Reed and Lopez. Information obtained from a resident in the neighborhood of Johnson's shooting sharpened the focus on Lopez. The witness reported seeing a man run down the sidewalk after the gunfire. During a photo show-up she picked out Lopez as appearing "most like the runner," but she could not make a definitive identification. Adding to the data pointing to Reed's involvement, a friend of his told the police that Reed had admitted to killing Johnson, confessing: "I got the wrong one, but I did it."

Dennis Hoskins supplied the core evidence tying Lopez to Johnson's murder. During his preliminary examination, Hoskins conceded that he faced a charge of assault with intent to commit murder arising from the drive-by shooting, and that Lopez had testified against him during the preliminary examination in that case. Several months after Johnson's shooting, Hoskins agreed to provide information to the police and prosecutor incriminating Reed and Lopez. He testified that both had admitted to participating in Johnson's murder, with Lopez acting as the trigger-man. According to Hoskins, Reed initially believed that Johnson was a man called "Zeke" who had shot and wounded Reed's brother some years earlier. Hoskins claimed that Reed and Lopez had openly discussed various details of Johnson's killing, including that the gun involved was a .380 caliber.

One week before the joint trial of Reed and Lopez was scheduled to begin, the prosecutor filed a motion to declare Hoskins "unavailable" as a witness and to admit his preliminary examination testimony pursuant to MRE 804(b)(1). The motion was based on a voicemail the prosecutor received from Hoskins' attorney, Robert Dunn, advising that Hoskins was no longer willing to testify.

The Court considered the prosecutor's motion on the day before trial. Hoskins asserted at this hearing, "I wish to testify at trial." A court officer then guided Hoskins from the courtroom.

The following morning, before jury selection, the prosecutor referenced an issue that had been discussed in chambers and off the record. He advised the court:

> [I]t was brought to my attention[] that as Mr. Hoskins was leaving the courtroom and after we had the hearing on the motion to declare him unavailable, that he made comments to [Lopez and Reed] to the effect that, "I've got you covered, bro."

The prosecutor explained that he had interpreted this statement to mean that Hoskins "may intend to perjure himself during this trial, or give testimony that's inconsistent with his testimony at the preliminary examination." Citing an unpublished opinion issued by this Court in 1997, the prosecutor requested that the court summon Hoskins and advise him, outside the presence of the jury, "of his Fifth Amendment right if he does intend to give perjured testimony, to make sure he is aware of his rights, and then determine what if anything he decides to do at that point."[1]

The prosecutor then brought to the trial court's attention that Reed's counsel, Edwin Johnson, III, had accused the prosecutor of "threatening or intimidating Mr. Hoskins during our colloquy with him yesterday morning." According to the prosecutor, attorney Johnson had been the first to advise Hoskins that he could face perjury charges. The prosecutor continued:

> I did follow that up with I'm not going to threaten you, but we will - - we could possibly charge you with perjury if you do say something that's inconsistent with what you testified to at the preliminary examination.

The prosecutor urged that this Court's unpublished 1997 case supported that "if I did in fact, I suppose, quote-unquote, threaten him, . . . the court says that's not a threat. That's just the reality. If you do provide perjured testimony, you could in fact be charged with perjury."

Attorney Johnson took issue with the prosecutor's reprise of the interaction. "It's not just that the prosecutor, in my view, threatened the witness," Johnson urged, "but he also stated to the witness that if he was convicted, he would be facing life in prison, which is a misstatement of the law."

Lopez's attorney interjected that he witnessed the interaction with Hoskins. He described that the prosecutor

> did in fact tell the witness that he would be looking at life. And the manner in which [the prosecutor] spoke was not as he spoke here; it was more of a threatening, kind of an aggressive statement to this young man. It wasn't just, well, these are your rights, young man. You know, just the tone of his voice, it sounded like a threat to me.

One of the investigating officers was also in the room during the discussion with Hoskins. She reported, "I didn't hear any threats or anything. [The attorneys] spoke to Mr. Hoskins just as they spoke to you . . . . I didn't hear any threatening from either one of them."

The court noted that Hoskins consulted with his own attorney before agreeing to testify. As neither Hoskins nor his counsel was present, the court indicated it would revisit the issue outside the presence of the jury when Hoskins took the stand.

---

[1] The case referred to was *People v Daniels*, unpublished opinion of the Court of Appeals, issued July 11, 1997 (Docket No. 184692).

Hoskins and his counsel, Dunn, were present on the third day of the trial. Attorney Dunn indicated that he and Hoskins had discussed the issue further. The following colloquy ensued:

> *Mr. Dunn.* I believe at this point, after considering the matter again, he wishes to exercise his Constitutional right under the Fifth Amendment of the United States Constitution and refuse to answer questions which could subject him, possibly, to a charge of perjury if he were to answer them.

> *The Court.* Mr. Hoskins, did you hear and understand what [your attorney] has stated to the Court?

> *The Witness.* Yes. The prosecutor's told me - - they threatened me with life in prison.

> *The Court.* Okay. With regard to your right to testify or not testify, do you wish to exercise your Fifth Amendment privilege and not testify at this time?

> *The Witness.* Yes, sir.

After Hoskins was escorted from the courtroom, the prosecutor renewed his motion to declare Hoskins unavailable and to admit his preliminary examination testimony pursuant to MRE 804(b)(1). Reed's counsel asked that "the record . . . reflect" that Hoskins had elected against testifying because he had been threatened with life imprisonment if his testimony differed from that given at the preliminary exam. Counsel requested that the jury be instructed that it was the prosecutor's duty to produce this witness who was rendered unavailable by the prosecution itself, and that the jury could "infer that his testimony would have been damaging to their case had he appeared."

Reed's counsel also objected to the admission of the preliminary examination testimony "because I can't cross-examine a transcript" and "there was evidence produced after the preliminary exam that would impeach his testimony during the preliminary exam." But counsel "reluctantly underst[oo]d that" the exam could be placed into evidence under the circumstances. Lopez's attorney further requested that the jury be advised of Hoskins' recent conviction and the court agreed.

The court proceeded to play the recording of Hoskins' preliminary examination testimony into the record. No explanation was given to the jury at that time regarding this procedure.

The following day, the prosecutor called attorney Dunn to the stand. Reed's counsel elicited the following information:

> *Q.* And isn't it true that [Hoskins] came in and put a statement on the record as it relates to whether he was going to testify in this trial or not?

> *A.* Just before the start of this trial, that's correct.

-4-

*Q.* And isn't it true that, in his statement, he said that he was taking the Fifth Amendment?

*A.* That's right. He was exercising his constitutional right not to testify.

*Q.* And isn't it true that he unsolicited - - in an unsolicited manner added to that that the reason that he was taking the Fifth Amendment is because he felt he had been threatened by the prosecution with life imprisonment?

*A.* Yes. I believe the prosecutor had told him that the penalty for perjury in a murder trial is up to life in prison, which is correct.

*Q.* Mm-hmm. But the penalty for perjury in a preliminary exam of a murder trial is not life imprisonment; is it?

*A.* No, it's 15 years. I don't know of anybody that would want to do 15 years in a Michigan prison.

*Q.* That wasn't the question I asked you. I asked you, isn't it true that wasn't - - that the penalty for telling an untruth in a preliminary exam is not life imprisonment?

*A.* I believe that's correct.

*Q.* And isn't it true that his statement was that he wasn't testifying because he felt as though the prosecution threatened him with life imprisonment?

*A.* No, that was an add-on, as you say, unsolicited statement, was not in response to the question. He did not want to take the chance that possibly he could be charged with perjury and face up to life in prison, so he exercised his Fifth Amendment right.

*Q.* Sir, is it not the truth that he sat on that stand, and in an unsolicited statement, under oath, stated that the reason he was taking the Fifth was because he felt threatened by the prosecutor, who had threatened him with life imprisonment? Isn't that what he said?

*A.* That's not exactly what he said.

Lopez's counsel then secured testimony that Hoskins had been charged with three counts of assault with intent to murder, which came with a possible life sentence. Hoskins ultimately pleaded to lesser counts of felonious assault, a four-year felony, Dunn testified.

On redirect, the prosecutor presented Hoskins' plea agreement in which he agreed to testify against Lopez and Reed. The document gave Hoskins advance warning of the consequences of perjury. The prosecutor also elicited that Hoskins did not tell Dunn that the prosecutor had threatened him before taking the stand and invoking his Fifth Amendment privilege.

On the final day of trial, Reed's counsel moved to strike Hoskins' testimony under MRE 804(a), which defines when a witness may be deemed unavailable. Counsel asserted that the prosecutor caused Hoskins' absence through his threats, vitiating the applicability of the MRE 804(b) hearsay exceptions.

The prosecutor denied making any threats and reiterated that Reed's counsel actually broached the subject with Hoskins. The prosecutor emphasized attorney Dunn's testimony regarding Hoskins' motivations. Moreover, the prosecutor argued that defense counsel had ample opportunity to cross-examine Hoskins at the preliminary examination.

The court ultimately ruled:

> Well, this is all very interesting and we've made a clear record of your positions. I'm going to deny the motion itself.

> The witness himself indicated he felt threatened; that's why he wasn't testifying. Mr. Dunn could say what he wanted to say, but I'm not going to take his testimony over the witness's testimony himself.

The jury subsequently convicted Lopez of first-degree premediated murder, conspiracy, and several weapons-related charges. Lopez now appeals, challenging only the admission of Hoskins' preliminary examination testimony.

## II. ANALYSIS

MRE 804(b)(1) excepts from the rule against hearsay a witness's prior testimony given under oath and subject to cross-examination by the opposing party if, as contemplated in MRE 804(a)(1), the witness is unavailable to testify because he or she has invoked a privilege. *People v Meredith*, 459 Mich 62, 65-66; 586 NW2d 538 (1998). The admission of former testimony tested by cross-examination generally comports with the requirements of the Confrontation Clause. See *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). However, MRE 804(a) posits that "[a] declarant is not unavailable as a witness if" his or her refusal to testify "is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying." Lopez contends that Hoskins could not be deemed unavailable because the prosecutor procured his absence by threatening him with a charge of perjury and lifetime imprisonment.

Lopez presents two closely interrelated arguments: that the prosecutor behaved wrongly in "threatening" Hoskins with a perjury prosecution, and that the prosecutor "procured" Hoskins' unavailability by virtue of the threats. We examine each in turn.

In *Webb v Texas*, 409 US 95, 95-96; 93 S Ct 351; 34 L Ed 2d 330 (1972), the United States Supreme Court reversed a defendant's conviction based on the conduct of the trial judge, who "on his own initiative, undertook to admonish" the sole defense witness that he would be prosecuted for perjury if he took "the witness stand and lie[d] under oath." The witness was serving a prison sentence at the time. "It will also be held against you in the penitentiary when you're up for parole," the judge declared, "and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath." *Id*. at 96.

The Supreme Court observed that the judge had not only "gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury," but had also

> implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. [*Id*. at 97.]

This conduct "effectively drove that witness off the stand," the Court held, "and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id*. at 98.

Our Supreme Court had confronted a somewhat analogous factual scenario two years before *Webb* was decided, and reached essential the same conclusion. In *Pena*, 383 Mich 402, the threat of perjury was made by a prosecutor rather than a judge. The prosecutor sent a letter to three defense witnesses, on official stationary, that simply quoted verbatim the statute punishing perjury.[2] Defense counsel moved to dismiss the charges "on the ground that the prosecutor's 'letter' violated the Fourteenth Amendment of the United States Constitution by intentionally intimidating the defense witnesses." *Id*. at 405. The trial court denied the motion. Two of the witnesses subsequently testified for the defense, while one called as a prosecution witness claimed to have forgotten her whereabouts at the relevant time. *Id*. at 407.

Three justices of the Supreme Court determined that a new trial was required, pithily observing:

> The Constitutional right of a defendant to call witnesses in his defense mandates that they must be called without intimidation. The manner of testifying is often more persuasive than the testimony itself.

---

[2] The letters read:

Dear Madam:

      In the interests of justice I am quoting Michigan Statutes Annotated 28.644, which provides as follows:

      "Any person who, being lawfully required to depose truth in any proceeding in a court of justice, shall commit perjury shall be guilty of a felony, punishable, if such perjury was committed on the trial of an indictment for a capital crime, by imprisonment in the state prison for life, or any term of years, and if committed in any other case, by imprisonment in the state prison for not more than fifteen (15) years."

Very truly yours,
G. E. Thick
Assistant Prosecuting Attorney [*Id*. at 405.]

A prosecutor may impeach a witness in court but he may not intimidate him—in or out of court.

Justices Adams and Brennan concurred, opining that they:

would remand to the trial court for a determination by that court as to whether or not the prosecutor's letter did intimidate the witnesses. If the court finds it did, the court should grant a new trial and the court's efforts to undo the damage upon such retrial should appear of record. If the court finds that no intimidation took place, the court should so find, stating its reasons for the finding, and a new trial should be denied. [*Id.*]

Thus, a plurality of the Court held in *Pena* that the prosecutor's conduct had been wrongfully threatening, but that remand was required to determine whether the threats had actually intimidated the witnesses.

This Court weighed in on the subject in *McIntosh*, 142 Mich App 314. *McIntosh* focused on the prosecution's conduct regarding witness Beverly Alexander, who testified against the defendant at his preliminary examination for charges of armed robbery, assault, and felony murder. *Id.* at 322. Alexander subsequently informed the police "that she had changed her mind and would refuse to testify at trial." *Id.* at 323. Shortly thereafter the prosecutor charged her with conspiracy to commit armed robbery and felony murder. *Id.* At McIntosh's trial, Alexander invoked the Fifth Amendment. *Id.* Over a defense objection, the court declared Alexander unavailable and allowed the use of her preliminary examination testimony pursuant to MRE 804(a)(2). "In so ruling," this Court recounted, "the court placed the burden of proving why Alexander was unavailable on defendant and refused to let the defense ask why she was pleading the Fifth Amendment because the question was 'irrelevant.' " *Id.*

This Court framed the appellate question presented as: "May a prosecutor, as the proponent of prior unrecorded testimony, induce the declarant to invoke her privilege against self-incrimination and still satisfy the 'unavailability' requirements of both the Confrontation Clause and MRE 804?" *Id.* at 324. We began our analysis by reciting the pertinent language of MRE 804(a): "[a] declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying." *McIntosh*, 142 Mich App at 324 (alteration in original). Given this language, we concluded that "if the prosecution brought about Alexander's failure to testify by prosecuting her with the intent of preventing her testimony, Alexander was not 'unavailable' and the trial court erred in admitting her preliminary examination testimony." *Id.*

The *McIntosh* Court then turned to case law centering on alleged violations of the Confrontation Clause stemming from *unintentional* prosecutorial conduct resulting in a witness's unavailability. *Id.* at 325-326. In several of those cases, courts required the prosecutor to demonstrate that the witness's unavailability "[was] not chargeable to them." *Id.* at 326 (citations omitted). This Court concluded that when the prosecution offers prior recorded testimony based on a witness's unavailability, "the burden is on the prosecution to establish that the witness . . . is, in fact, 'unavailable' and that the prosecution has not, either intentionally or

-8-

negligently, contributed to making the witness unavailable." *Id*. at 327. As to witness Alexander, the Court held that because the trial court had "improperly placed the burden of proving why Alexander was unavailable on defendant and precluded inquiry into why Alexander was pleading the Fifth Amendment, we are unable to determine whether or not the prosecution was intentionally or negligently responsible for Alexander's becoming unavailable." *Id*. The Court remanded to the trial court for an evidentiary hearing at which the prosecution would bear the burden of showing "that it was not intentionally or negligently responsible for Alexander's refusal to testify." *Id*. at 328.

In both *Pena* and *McIntosh*, the Courts ordered remands for the collection of evidence regarding the cause of the unavailable witness's refusal to appear. In the case before us, remand for an evidentiary hearing is unnecessary, as the trial court has already made the requisite finding. Based on Hoskins' and the lawyers' recapitulations of what occurred after Hoskins indicated his willingness to testify, the trial court determined that Hoskins invoked the Fifth Amendment because "he felt threatened; that's why he wasn't testifying." And because the prosecutor's threats procured Hoskins' unavailability, we hold that a new trial is required.

We begin by addressing the prosecution's argument that Hoskins was merely "advised" of the possibility of prosecution for perjury and not "threatened" with such a charge. The record refutes this characterization. Despite that Hoskins was represented by counsel, the prosecutor not only invoked the specter of prosecution for perjury; he informed Hoskins that he risked incarceration "for life" if convicted. The prosecutor's statements exceeded mere advisement, and crossed into the realm of threat and intimidation.

While a prosecutor may inform a witness that false testimony may result in a perjury charge, the circumstances surrounding the prosecutor's intervention following Hoskins' declaration demonstrate that the prosecutor went well beyond merely "advising." Hoskins had not yet *offered* any testimony, and whether he planned to recant his preliminary exam statements or testify falsely was unknown. Moreover, this Court has emphasized that when a prosecutor suspects that a witness may perjure himself,

> it is a better practice for the prosecutor to inform the court, in the appropriate case, out of the presence of the witness, of the possible need for a witness to be informed of his or her rights under the Fifth Amendment. The prosecutor should further state the basis for such request and the trial judge shall exercise his discretion in determining whether such warnings should issue. If the trial judge determines that such warnings are appropriate under the facts presented then the court shall inform the witness of his rights under the Fifth Amendment on the record out of the presence of the jury, if that be the case. [*People v Callington*, 123 Mich App 301, 307; 333 NW2d 260 (1983).]

Because Hoskins was represented by counsel, the prosecutor was under no obligation to warn Hoskins of a risk of committing perjury. Nor did the situation merit a warning, particularly as to the potential of life imprisonment, given that the prosecutor had only a hunch that Hoskins would deviate from his preliminary examination statements. Regardless of the prosecutor's "tone of voice," we find it difficult to justify the prosecutor's "warning" given *Pena*'s condemnation of a letter written in the most sterile of terms relaying precisely the same

information. There, as here, the information was conveyed to coerce or intimidate rather than merely to "inform." In *Pena*, an evidentiary hearing was required because the record did not reveal whether the witnesses were actually intimidated. Here, the trial court explicitly found that Hoskins refused to testify because he felt "threatened," obviating the need for additional fact finding.

We draw additional support for our conclusion from the New Jersey Supreme Court's opinion in *State v Feaster*, 184 NJ 235; 877 A2d 229 (2005). In *Feaster*, a "key" prosecution witness scheduled to testify at defendant's post-conviction relief hearing recanted his trial testimony in an affidavit provided to the defendant's attorney. *Id*. at 240. Before the witness could testify, the prosecutor advised the witness's attorney "that there would be 'considerations' if he testified consistent with his recantation statement." *Id*. At the hearing, the witness withdrew his affidavit and invoked his Fifth Amendment privilege. *Id*. The New Jersey Supreme Court held that the prosecution had "substantially interfered" with the witness's decision to testify, violating the defendant's state constitutional rights. *Id*.

*Feaster* is instructive for several reasons. First, the prosecutor in that case, as here, insisted that his warning of "considerations" did not amount to a "threat" and was not "inappropriate." *Id*. at 247. The New Jersey Supreme Court forcefully rejected the notion that the prosecutor's behavior was appropriate:

> The State has no affirmative duty to tell a witness, subpoenaed by the defense, that he could be prosecuted if his testimony is different from his previously sworn testimony and inconsistent with the State's theory of the case. We do not find that such warnings by the State are a pre-condition to a perjury or false swearing prosecution. In other words, a witness does not have to be told that if he testifies falsely he will be subject to prosecution.
>
> * * *
>
> . . . Whether the threat of a perjury prosecution is delivered conversationally, in transparently coded language, or loudly, in pointedly brash language, the effect is likely to be the same on the witness, even if the conduit is his attorney. The message to [the witness] was clear enough. We accept for the purpose of this discussion that the . . . prosecutor acted in good faith. Even crediting the . . . prosecutor with the best possible motives, defendant nonetheless was deprived of his most essential witness at the . . . hearing.
>
> . . . [I]t is not the function of the State to save a defense witness from himself or to spare the court a supposed falsehood, at the expense of denying the court critical testimony. To the extent possible, the . . . court was entitled to the testimony of every witness. The State may think that it alone knows the truth, but it is for the court to decide the truth, after both sides have presented their cases. If falsehood is to be exposed, the State has a fair opportunity to do so on cross-examination. [*Id*. at 258-260.]

We find this reasoning compelling.

Second, the *Feaster* Court emphasized that the prosecutor's "good faith" in expressing the warning did not determine whether the words were coercive. Even if the motivations of the prosecutor were pure, the Court reasoned, such a warning "does not advance the truth-seeking function of a trial[.]" *Id*. at 261. "We have confidence that our courts and juries are capable of detecting falsehoods with the aid of the adversarial process. The State can prosecute those who commit perjury or false swearing; the State simply cannot threaten a defense witness to keep him off the stand." *Id*.

We highlight that in the case before us, the prosecutor lacked any reasonable basis to suspect that Hoskins would lie on the witness stand. The prosecutor himself did not hear Hoskins state "I've got you covered, bro;" rather the prosecutor quoted some unknown person who allegedly heard the statement ("[I]t was brought to my attention, that as Mr. Hoskins was leaving the courtroom . . . that he made comments to Mr. Lopez and Mr. Reed to the effect that, 'I've got you covered, bro.' "). This hearsay simply does not provide a sufficient basis for suspecting that perjury was in the offing, or for issuing a perjury warning.

MRE 804(a)(5) provides that a witness is not "unavailable" if the party's absence "is due to the procurement or wrongdoing of the proponent" of the testimony. We construe a rule of evidence in the same manner as a court rule or statute. *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002). "In general, 'or' is a disjunctive term, indicating a choice between two alternatives[.]" *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 148; 783 NW2d 133 (2010). Accordingly, the definition of "unavailability" set forth in MRE 804(5) precludes a court from finding a witness unavailable if the witness's absence is "due to" either "the procurement" or the "wrongdoing" of the proponent of the testimony. Our decision rests on the trial court's finding that the perjury warning issued by the prosecutor procured Hoskins' unavailability.

*Black's Law Dictionary* (10th ed), p 1401, defines "procurement" as "[t]he act of getting or obtaining something or of bringing something about." "Rule 804 provides that if the unavailability was caused by the party offering the hearsay statement, the requirement of unavailability will not be regarded as satisfied." 4 Weinstein & Berger, Evidence, ¶ 804(a)[01], p 804-36.

The trial court recognized that Hoskins refused to testify due to the prosecutor's threat, yet failed to connect its finding with the rule's command that "procurement" of a witness's absence nullifies the witness's unavailability. Because the prosecutor improperly silenced Hoskins, the court was required to exclude Hoskins' preliminary examination testimony in the first instance, or to strike the testimony from the record thereafter. By admitting prior testimony in clear violation of the evidentiary rules designed in part to protect a defendant's right to confront the witnesses against him, the trial court violated Lopez's fundamental right to a fair trial, abusing its evidentiary discretion. This error was far from harmless. The prosecutor asserted during his closing argument, "what this case boils down to is the testimony of Denis Hoskins[.]" Our review of the record confirms that aside from Hoskins' testimony, the evidence against Lopez was thin at best. The prosecutor correctly concluded in closing that "[I]t's Mr. Hoskins' testimony that signs, seals, and delivers only one conclusion, and that's that the defendants who are sitting here today are guilty." Therefore, we must vacate Lopez's convictions and sentences.

On retrial, Hoskins may elect to testify.  If he maintains his silence, his preliminary examination testimony may not be presented to the jury.

We vacate Lopez's convictions and sentences and remand for a new trial at the prosecution's discretion.  We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher