# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DASHAWN MARTISE CARTER,

      Defendant-Appellant.

UNPUBLISHED
July 18, 2017

No. 332414
Ingham Circuit Court
LC No. 15-000411-FC

Before: SERVITTO, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to serve life in prison without parole for his first-degree murder conviction and to a consecutive term of two years' imprisonment for felony-firearm. We affirm.

## I. FACTS

Defendant attended a barbecue hosted by the decedent, Eric Jackson. During the festivities, defendant and Jackson quarreled, and a physical fight between the two men ensued. Defendant ran toward the home of neighbor Rachel Reynolds and Jackson was returning to his own home when defendant yelled that Jackson "better make sure you go get a gun." This provoked Jackson, who ran toward Reynolds' porch to confront defendant a second time. Reynolds allowed defendant inside, but her boyfriend, Walter Sweat, prevented Jackson from entering and encouraged him to go elsewhere. An argument between Jackson and Sweat broke out after Jackson pushed Sweat. While Jackson was arguing with Sweat, defendant left Reynolds's home through the front door and headed to a neighboring apartment complex. Neighbors reported that defendant walked by and mentioned "gun play" and warned them to get inside. Defendant knocked on the door of one of the apartments and requested that three of the men then present in the apartment come with him. Shortly thereafter, witnesses reported seeing defendant return to the area where Jackson and Sweat were arguing. Witnesses reported seeing defendant fire a gun at Jackson, though they were unable to agree on the exact number of shots fired. Jackson ran after the shots broke out, and an officer discovered his body on the side of the road. First responders pronounced Jackson dead at the scene, and an autopsy revealed that a bullet had pierced his right lung and heart before lodging in his left lung.

## II. PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor committed misconduct and violated defendant's due-process rights by intimidating a witness favorable to the defense. "Generally, a claim of prosecutorial misconduct is a constitutional issue reviewed de novo." *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). A defendant has a constitutional right to present a defense, which includes the right to call witnesses. US Const, Ams VI, XIV; Const 1963, art 1, § § 13, 20; *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). "It is well settled that a prosecutor may not intimidate witnesses in or out of court." *People v Layher*, 238 Mich App 573, 587; 607 NW2d 91 (1999). A prosecutor violates a defendant's constitutional right to due process of law by preventing a witness from testifying through intimidation. *People v Hill*, 257 Mich App 126, 135; 667 NW2d 78 (2003). "However, a prosecutor may inform a witness that false testimony could result in a perjury charge." *Layher*, 238 Mich App at 587. See also *People v Robbins*, 131 Mich App 429, 439; 346 NW2d 333 (1984) (stating that if threatening language is not used, warning a potential defense witness about self-incrimination or possible perjury charges is proper). Significantly, this Court has recognized that "under certain circumstances, the prosecutor, as an officer of the Court, has a duty to inform the Court that it may be necessary for the Court to inform a witness of his rights under the Fifth Amendment." *People v Callington*, 123 Mich App 301, 306-307; 333 NW2d 260 (1983). Such circumstances might arise because trial judges are generally not aware of the content of a proposed witness's testimony. *Id*. at 307. The prosecutor should share this information with the court outside of the witness's presence, and if the court determines that it is necessary to inform the witness of his or her Fifth-Amendment rights, the court should do so outside of the presence of the jury. *Id*.

In the instant case, defense counsel asserted during his opening statement that Miranda Case had made a statement to the police that she heard three shots fired shortly after defendant fired the first shot. Defense counsel implicitly suggested that defendant did not fire these three shots and that they caused Jackson's death because it was unlikely that Jackson could travel roughly 200 yards before expiring if defendant's bullet punctured Jackson's lungs and heart. Later, the prosecutor informed the court that, after reflecting on defense counsel's opening statements about Case, he believed that Case would need to be informed of her Fifth Amendment right against self-incrimination because she had committed a crime by lying to the police.[1] The prosecutor explained that Case made a statement to the police and then stated in a second

---

[1] Under MCL 750.479c(1)(b), it is unlawful for a person to "[k]nowingly and willfully" make any statement to a peace officer conducting a criminal investigation that the person "knows is false or misleading regarding a material fact in that criminal investigation." If the crime being investigated is first-degree murder, violating MCL 750.479c is a felony punishable by "imprisonment for not more than 4 years or a fine of not more than $5,000.00 or both[.]" MCL 750.479c(2)(d)(*i*).

statement that she had lied in the first.[2] The trial court decided to appoint counsel to advise Case about her Fifth-Amendment rights.

When Case was called, her appointed attorney explained that Case would assert her Fifth Amendment right against self-incrimination "as it relates to any statements that she provided to the police." The court questioned Case, who confirmed that she had voluntarily decided to exercise her Fifth Amendment right after consulting with her attorney. The prosecutor asserted that the court had previously discussed that Case's right against self-incrimination would apply on a question-by-question basis, but asserted that it would be futile for defendant to elicit her testimony because on cross-examination he would ask whether she had lied to the police — a matter addressing credibility — and the court's only remedy, given her invocation of the Fifth Amendment before the jury, would be to strike her entire testimony. Both the court and defense counsel agreed with this analysis, though defense counsel specified that he was not waiving any objection to the fact that Case would not be testifying. Case never testified before the jury at trial.

These facts indicate that the prosecutor did not threaten or intimidate Case to prevent her from testifying. The prosecutor was following a procedure recommended by this Court when he asked the trial court to consider informing Case about her rights under the Fifth Amendment. In *Callington*, this Court explained that if a prosecutor suspects a witness might incriminate himself or herself,

> it is a better practice for the prosecutor to inform the Court, in the appropriate case, out of the presence of the witness, of the possible need for a witness to be informed of his or her rights under the Fifth Amendment. The prosecutor should further state the basis for such a request and the trial judge shall exercise his discretion in determining whether such warnings should issue. If the trial judge determines that such warnings are appropriate under the facts presented then the court shall inform the witness of his rights under the Fifth Amendment on the record out of the presence of the jury, if that be the case. [*Callington*, 123 Mich App at 307.]

The prosecutor in the instant case followed the procedure outlined in *Callington*. The prosecution informed the court that Case might need to be advised of her Fifth-Amendment rights outside of Case's presence, explained the reason why, and the court exercised its discretion by deciding to do so. Additionally, the prosecutor stated that he had never spoken to Case when he first informed the court that he believed Case should be informed of her Fifth-Amendment

---

[2] Case initially stated that she saw defendant walk out of Reynolds' back door, produce a gun, and fire at Jackson. Case contacted the police and made a second statement indicating that defendant and Jackson were actually in opposite positions, she did not see defendant clearly, and she only saw that defendant had something in his hand that she could not identify. Case explained that she felt bad about lying and had made her first statement more detailed because she wanted defendant to get in trouble.

rights.[3] Thus, there is no evidence that the prosecutor ever intimidated or threatened Case. And there is no evidence that the trial court's questioning intimidated Case either. Case conferred with court-appointed counsel about her Fifth-Amendment rights, and the trial court merely confirmed that she had exercised an opportunity to discuss her situation with counsel and freely chose to exercise her right not to testify.

Defendant argues that it was improper or not necessary to inform Case of her Fifth-Amendment rights because she had already admitted in her second statement to the police that she had lied in her first statement. Stated another way, defendant asserts that a witness need not be informed of the right against self-incrimination if the witness previously made an incriminating statement to the police. But defendant does not provide any legal authority to support this argument. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." *People v Wyngaard*, 462 Mich 659, 671; 614 NW2d 143 (2000), quoting US Const, Am V. This prohibition "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v Murphy*, 465 US 420, 426; 104 S Ct 1136, 1141; 79 L Ed 2d 409 (1984) (citation and quotation marks omitted). Thus, the Fifth Amendment plainly protected Case from answering a question about whether she had lied to the police because such an answer might serve to incriminate her at a future criminal proceeding. A defendant that awaits sentencing after pleading guilty may still invoke the Fifth Amendment's protection against self-incrimination. *Mitchell v United States*, 526 US 314, 327; 119 S Ct 1307; 143 L Ed 2d 424 (1999). If a defendant who pleaded guilty may still invoke Fifth Amendment protections against self-incrimination, then the Fifth Amendment's protection surely encompasses a witness like Case who already made an incriminating statement. Therefore, defendant's argument that the trial court improperly informed Case of her Fifth-Amendment rights is unavailing.

Defendant also argues that the prosecutor intimidated Case by singling her out for a warning about her Fifth-Amendment rights. However, on the first day of trial, the prosecutor identified four other witnesses[4] that he believed should be informed of their Fifth-Amendment rights based on their possible criminal liability if they aided defendant. Thus, Case was not singled out as the only witness that needed to be informed of the protections granted by the Fifth Amendment. In a similar vein, defendant argues that the prosecutor selectively requested that Case receive a warning about self-incrimination while not requesting the same warning for a witness favorable to the prosecution, Swain, who also lied to the police. However, the prosecutor explained that he did not request a Fifth Amendment warning for Swain because he believed she could not be charged with making a false or misleading statement to a police officer

---

[3] While the prosecutor asserted that he had never spoken to Case, he did indicate that Case had been in contact with the prosecutor's office via telephone and email. However, there was no indication that Case was ever threatened or intimidated.

[4] These potential witnesses were the occupant of the apartment that defendant went to before the shooting and the three men that were present there at the time.

where she corrected her misstatements and lies over the course of one interview. He distinguished this case, noting that Case lied in her first statement to police and did not retract her misstatements until making a second statement. Given this distinction, we are not persuaded that the prosecutor selectively asked the court to warn only Case in order to achieve a strategic advantage at trial.

Finally, defendant contends that the prosecution should have addressed the issue with a pretrial motion in limine rather than waiting until after defense counsel promised the jury that it would hear Case's testimony in his opening statement. Stated another way, defendant contends that the prosecutor waited and used the warning about Fifth-Amendment rights as a maneuver to deter Case from testifying only after hearing that Case's testimony was critical to the defense. When informing the trial court that Case should be informed of her Fifth-Amendment rights, the prosecutor asserted that he did so after "reflecting on" defense counsel's opening statement. But the prosecutor responded below to defendant's argument that he had strategically waited by explaining that he and defense counsel had exchanged emails, they agreed on witnesses to exclude, and he was never informed that Case was a witness that defendant definitely intended to call. He explained that his plan was to let other witnesses provide testimony about the shooting and to address Case's potential testimony "depending on how things bore out." He explained that he was forced to address the issue of Case's potential self-incrimination earlier because of defense counsel's opening statement relying on her testimony. It does not appear that the prosecutor's actions were strategically calculated.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). In this instance, defendant failed to demonstrate that the prosecutor violated his due-process rights and denied him a fair and impartial trial by asking the court to inform Case about her rights under the Fifth Amendment.[5]

## III. SUFFICIENCY OF THE EVIDENCE

Defendant also contends that there was insufficient evidence to convict him of first-degree murder. This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Cline*, 276 Mich App 634, 642, 741 NW2d 563 (2007). When reviewing such a challenge, this Court reviews "the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

---

[5] This case is distinguishable from *People v Lopez*, 316 Mich App 704, 706; 892 NW2d 493 (2016) wherein the prosecutor personally threatened a witness that deviation from his preliminary examination testimony would "result in prosecution for perjury and life imprisonment on conviction." The prosecutor in the present matter had no such personal exchange with a witness, nor was the attention brought to the trial judge that a witness may need to be advised of her 5th amendment rights intimidating in the manner in which a personal confrontation and threat of life imprisonment may be deemed to be.

"Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). Any conflicting evidence must be resolved in favor of the prosecution. *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997). Questions of credibility are left to the trier of fact and will not be resolved anew by this Court. *People v Avant*, 235 Mich App 499, 506; 597 NW2d 864 (1999).

The elements of first-degree premeditated murder are: "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). The specific intent to kill element of first-degree murder may be inferred from any facts in evidence. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). While not specific to first-degree murder, the identity of the perpetrator is an element of every criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

The prosecution adduced sufficient evidence to prove each element of first-degree murder beyond a reasonable doubt. There was ample evidence that defendant intentionally shot Jackson. Indeed, multiple witnesses testified that they saw defendant fire a gun at Jackson. There was also ample evidence that defendant's actions were premeditated and deliberate because witnesses testified that defendant threatened to get a gun, yelled that Jackson should get a gun, and warned neighbors to get inside shortly before the shooting.

Defendant argues that there was insufficient evidence because there was no evidence connecting the shot he fired to the one that killed Jackson. Defendant bases this claim on the fact that Jackson's body was discovered 183 yards from the scene of the shooting and on his representation that forensic pathologist Michael Markey testified that Jackson could have travelled only 50 to 100 yards given his punctured lungs and heart. Defendant asserts that this generates reasonable doubt that defendant's bullet hit Jackson and demonstrates that some other shooter must have been involved. Defendant's argument mischaracterizes Markey's testimony. Markey asserted that given Jackson's wounds, it would be "within reason" to conclude that he could run 50 or 100 yards before expiring. But when pressed, Markey also asserted that he "wouldn't be surprised" if a person with Jackson's wounds could run as far as 100 to 200 yards before succumbing to his injuries. Thus, the fact that the police discovered Jackson's body approximately 183 yards from the scene of the shooting is consistent with defendant's bullet being the cause of Jackson's demise. In short, there was sufficient evidence to convict defendant when viewing the evidence in the light most favorable to the prosecution.

Affirmed.

/s/ Deborah A. Servitto
/s/ Christopher M. Murray
/s/ Stephen L. Borrello